UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| HAYDN GABRIEL LOHSE | § | |
| **Plaintiff** | § | |
| | § | |
| V. | § | **Case No. 5:21-CV-143-RWS-JBB** |
| | § | |
| UNUM LIFE INSURANCE COMPANY | § | |
| OF AMERICA | § | |
| **Defendant** | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following motions are before the Court:

**Defendant's Motion to Summary Judgment and Brief in Support (Dkt. No. 21); and**

**Plaintiff's Motion for Summary Judgment and Brief in Support (Dkt. No. 22).**

This case is governed by the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. (ERISA). The parties dispute whether Plaintiff Haydn Gabriel Lohse ("Plaintiff"), is entitled to accidental death and dismemberment benefits under a group policy sponsored by his deceased's brother's employer and issued by Defendant Unum Life Insurance Company of America ("Unum"). Both Plaintiff and Unum have moved for summary judgment. The Court, having carefully reviewed the parties' written submissions, the administrative record, and the applicable law, recommends both motions be **GRANTED IN PART AND DENIED IN PART**.

Unum, the party whose decision is under review, essentially conceded in its briefing that *de novo* review is required. Using that *de novo* standard, the undersigned concludes, for the

1

reasons set forth below, that Unum has not met its burden of proving an exclusion bars Plaintiff's accidental death benefit recovery. Therefore, the Court recommends Unum's motion for summary judgment be denied, and Plaintiff's motion for summary judgment be granted, as to Plaintiff's claim for wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B). However, the Court recommends Unum's motion for summary judgment be granted, and Plaintiff's motion for summary judgment be denied, as to Plaintiff's claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). Finally, the Court finds Plaintiff's claim for attorney's fees and costs is premature. The Court therefore recommends Plaintiff's motion for summary judgment as to Plaintiff's claim for attorney's fees and costs under 29 U.S.C. § 1132(g)(1) be denied without prejudice to refiling.

## I.    BACKGROUND

Jay Lohse ("Mr. Lohse") passed away on November 29, 2019 due to blunt force trauma to the head resulting from a car accident. At the time of his death, Mr. Lohse was an employee of Central Research Inc. ("Central Research"). Plaintiff is the beneficiary under two group insurance policies that Unum issued to Central Research. The policies provide life as well as accidental death and dismemberment ("AD&D") coverage, and Plaintiff made a claim for both types of benefits following the death of his brother. Although Unum determined that Plaintiff was entitled to $142,000 in life benefits, Unum determined Plaintiff was not entitled to AD&D benefits under the policy because one or more coverage exclusions apply. Plaintiff filed this suit in November 2021, seeking judicial review of Unum's denial of AD&D benefits. Plaintiff asserts claims for (1) wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B), and (2) breach of fiduciary duty under 29 U.S.C. § 1132(a)(3).

## II.  LEGAL STANDARDS

### A.    Summary judgment

The court may grant summary judgment where the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When reviewing the evidence on a motion for summary judgment, courts must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *Koch v. Metro. Life Ins. Co.*, 425 F. Supp. 3d 741, 744 (N.D. Tex. 2019) (citing *Walker v. Sears, Roebuck & Co*., 853 F.2d 355, 358 (5th Cir. 1988)). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Rather, if there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Id.* (quoting *Anderson*, 477 U.S. at 250).

### B.    ERISA

"ERISA provides certain minimal procedural requirements upon an administrator's denial of a benefits claim." *Taylor v. Unum Life Ins. Co. of Am*., No. CV 21-331-JWD-EWD, 2023 WL 2766018, at *12 (M.D. La. Mar. 31, 2023) (quoting *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 539 (5th Cir. 2007) (citation omitted in *Taylor*), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co*., 560 U.S. 242 (2010)). "These procedures are set forth in 29 U.S.C. § 1133 and the regulations promulgated by the Department of Labor thereunder." *Id*. The statute requires every employee benefit plan governed by ERISA to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under

3

the plan has been denied" and "afford a reasonable opportunity" for a "full and fair review" of the denial. *Id.* (quoting 29 U.S.C. § 1133).

A plan administrator must substantially comply with ERISA procedures. *Bunner v. Dearborn Nat'l Life Ins. Co.*, 37 F.4th 267, 272 (5th Cir. 2022) (citing *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392 (5th Cir. 2006)). Technical non-compliance is excused if the purposes of Section 1133 are fulfilled. *See id.* Those purposes include promoting resolution of the dispute at the administrative level and facilitating a meaningful dialogue between the plan administrator and the beneficiary. *Id.* (citing *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 540 (5th Cir. 2007), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010)).

Section 502(a)(1)(B) provides a cause of action for a participant or beneficiary to seek judicial review of an administrator's benefits determination. 29 U.S.C. § 1132(a)(1)(B). The standard of judicial review afforded ERISA benefits determinations depends upon whether a plan administrator is vested with certain discretionary authority. Absent a valid delegation clause vesting the claims administrator with discretionary authority, the standard of judicial review for ERISA benefits denials challenged under 29 U.S.C. § 1132(a)(1)(B) is *de novo*. *Gray v. Minnesota Life Ins. Co.*, No. CV H-19-4672, 2021 WL 861298, at *1 (S.D. Tex. Mar. 8, 2021) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948 (1989); also citing *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 256 (5th Cir. 2018) (en banc) (adopting the majority approach and holding that the *de novo* standard in *Firestone* applies when reviewing a denial of benefits regardless of whether that denial is based on legal or factual grounds)).

Despite allegations in the pleadings regarding the abuse of discretion standard of review,[1] both parties now agree in their summary judgment motions that the standard of review in this case is *de novo*. Dkt. No. 21 at 20 ("To decide Plaintiff's Section 502(a)(1)(B) claim, the Court applies a *de novo* standard of review to Unum's decision."); Dkt. No. 22 at 13 ("Due to the fact that Central Research is allocated as Plan Administrator and has no discretionary authority with respect to the decision at issue, the standard of review should be *de novo*."). "Although the Fifth Circuit has not specified what *de novo* review requires in ERISA cases, other circuits and district courts provide instructive guidance." *Holman v. Life Ins. Co. of N. Am.*, 533 F. Supp. 3d 502, 505 (S.D. Tex. 2021) (quoting *Batchelor v. Life Ins. Co. of N. Am.*, 504 F.Supp.3d 607, 609 (S.D. Tex. 2020) (Ellison, J.)).

"Under the *de novo* standard of review, the court's task is to determine whether the administrator made a correct decision.'" *Id*. (quoting *Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1030 (E.D. Tex. 2019) (quoting *Niles v. Am. Airlines, Inc.*, 269 Fed. Appx. 827, 832 (10th Cir. 2008))). The decision to deny benefits is "not afforded deference or a presumption of correctness." *Id.* The court "must stand in the shoes of the administrator and start

---

[1] In the context of ERISA, the abuse of discretion standard of review "is the functional equivalent of arbitrary and capricious review." *Krishna v. Nat'S Union Fire Ins. Co. of Pittsburgh, PA.*, No. CV H-22-3423, 2023 WL 3887814, at *4 (S.D. Tex. June 8, 2023) (citation omitted). In his original complaint, Plaintiff alleges Unum's decision was "wrong" and "arbitrary and capricious." Dkt. No. 1, ¶ 30; *see also id*. at 5, n. 1 (reserving the right to argue regarding the proper standard of review). In Unum's answer, Unum alleges it properly exercised discretion in considering Plaintiff's claim, and therefore its decisions are "entitled to deferential review." Dkt. No. 5 at 8 (Sixth Defense); *see also id*. at 8 (Eighth Defense) (alleging Plaintiff's claims are barred because the actions of Unum are not incorrect, arbitrary, capricious, unreasonable, or made in bad faith).

Plaintiff further alleges that Unum is both ultimate decision-maker (claims administrator, claims-review fiduciary, claims fiduciary) and payer/funding source of any benefits, and thus Unum has a financial conflict of interest/bias that may impact the standard of review used by the Court. Dkt. No. 1, ¶ 9. Such a conflict should be weighed as a factor in determining whether there is an abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115, 128 S. Ct. 2343, 2350, 171 L. Ed. 2d 299 (2008) (internal quotation marks and citation omitted); *see also Wittmann v. Unum Life Ins. Co. of Am.*, No. CV 17-9501, 2019 WL 763509, at *10 (E.D. La. Feb. 21, 2019), *aff'd*, 793 Fed. Appx. 281 (5th Cir. 2019). Here, *de novo* review applies, and Plaintiff does not raise the conflict-of-interest issue in its briefing.

from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." *Id*. (quoting *Byerly v. Standard Ins. Co*., No. 4:18-CV-00592, 2020 WL 1451543, at *18 (E.D. Tex. Mar. 25, 2020), *aff'd*, 843 Fed. Appx. 572 (5th Cir. 2021) (citation omitted in *Holman*)).

## C.    Procedure for deciding ERISA claims subject to *de novo* review

The parties agree that the Court should decide this case on the written submissions of the parties and have filed cross motions for summary judgment (Dkt. Nos. 21, 22). Unum has also filed the administrative record compiled by Unum during the administration of Plaintiff's claim (the "Administrative Record") (Dkt. No. 20). Here, the Court remains within the bounds of the 1,156 page Administrative Record, which will be cited herein as "AR."

The Fifth Circuit recently acknowledged "[t]here is an open question whether it is appropriate to resolve ERISA claims subject to de novo review on summary judgment, or whether the district court should conduct a bench trial." *Katherine P. v. Humana Health Plan, Inc*., 959 F.3d 206, 208 (5th Cir. 2020). The Fifth Circuit declined to answer the open question because the parties did not raise it. *Id.* Instead, the court decided the appeal using "normal summary judgment standards." *Id*. Under those standards, the Fifth Circuit reversed entry of summary judgment for the defendant and remanded for further proceedings due to a genuine issue of material fact precluding summary judgment. The court explained as follows:

> On remand, the district court may, in its discretion, decide to treat as established other material facts it determined in ruling on the summary judgment motions. *See* FED. R. CIV. P. 56(g); *Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir. 1975). And while we leave the exact procedures to the district court's sound discretion, there is authority that it need not conduct a traditional trial but rather just review the administrative record and make findings of fact and conclusions of law. *See* *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999) (en banc) (discussing that procedure).

*Id.* at 209-10.

Here, the Court finds that summary judgment is the proper vehicle for the present dispute. As in *Katherine P.*, the parties here consent to resolution on summary judgment and have submitted the matter to the Court on cross motions for summary judgment. No party has suggested the Rule 52 is the appropriate procedural mechanism for deciding the case. *See Talasek v. Unum Life Ins. Co. of Am.*, No. 4:18-CV-3306, 2020 WL 7775450, at *2 (S.D. Tex. Dec. 15, 2020), *report and recommendation adopted*, No. 4:18-CV-3306, 2020 WL 7773899 (S.D. Tex. Dec. 30, 2020), *aff'd sub nom. Talasek v. Nat'l Oilwell Varco, L.P.*, 16 F.4th 164 (5th Cir. 2021) (deciding the case under summary judgment standards based, in part, on the parties' request). In affirming the decision in *Talasek*, the Fifth Circuit noted that "[s]tandard summary judgment rules control in ERISA cases." *Talasek v. Nat'l Oilwell Varco, L.P.*, 16 F.4th 164, 168 (5th Cir. 2021), *cert. denied*, 212 L. Ed. 2d 797, 142 S. Ct. 2739 (2022) (citations omitted). The Fifth Circuit also noted that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[2] *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation omitted in *Talasek*)).

---

[2] Here, the parties do not disagree on the material facts and both rely on only the Administrative Record as their summary judgment evidence. *See* Dkt. No. 23 at 3 ("Plaintiff does not dispute that Unum's facts can be confirmed via the administrative record, just as Plaintiff's statement of undisputed facts are established from exhibits pulled from the administrative record provided by defendant."); The parties only disagree as to whether Unum's conclusions are consistent with the Administrative Record. *Id.* ("What Plaintiff disagrees with are the conclusions that Unum pulled from the record. . . ."); *see also id.* at 4 ("None of the records indicate that Mr. Lohse was 'treating for' narcolepsy. To make sure conclusions is inconsistent with the administrative record.").

### III. MATERIAL FACTS BASED ON
### *DE NOVO* REVIEW OF ADMINISTRATIVE RECORD

**A.    Group Policies**

Unum issued two group insurance policies (collectively, "Group Policies") to Central Research, Inc. ("Central Research"). AR 328–93, 1050–127. The Group Policies fund, in part, ERISA welfare benefits plans sponsored by Central Research. AR 382, 1116. The first of these policies provides "basic" life and accidental death coverage for eligible employees (the "Basic Group Policy"). AR 331–334.

Prior to his death in late November of 2019, Jay Lohse ("Mr. Lohse") had been a fulltime employee of Central Research since January 7, 2019. As part of his employment, Mr. Lohse automatically received basic life and AD&D coverage pursuant to the terms of the Basic Group Policy, and Central Research paid for the entire cost of this coverage. AR 331, 333. For covered employees in Mr. Lohse's class, identified in the Group Policies as "Non SCA," the Basic Group Policy provided life insurance in an amount equal to their annual salaries, rounded to the next higher multiple of $1,000 if the amount was not already a multiple of $1,000, up to a maximum of $100,000. AR 11, 331. For Mr. Lohse, the amount of coverage was $42,000. AR 11, 122. The Basic Group Policy also provided an equal amount of AD&D coverage. AR 333–34. The other group policy at issue provides "supplemental" life and AD&D coverage (the "Supplemental Group Policy"). AR 1050–127. Under this policy, Central Research employees can elect to have additional life and/or AD&D coverage in $10,000 increments. AR 1052–56. Employees are responsible for paying the cost of any such coverage they elected. AR 1052, 1055. According to Central Research, Mr. Lohse elected $100,000 in supplemental life insurance and $100,000 in supplemental AD&D insurance. AR 1009. The beneficiary of both policies was Plaintiff, Mr. Lohse's brother. AR 506. Dkt. No. 21, Ex. 2 (Enrollment Summary at 1-2).

**B.      Relevant provisions of the Group Policies**

The Group Policies set forth the conditions under which insured employees or their beneficiaries are entitled to payments, or "benefits." Under each policy, a life insurance benefit is payable to the employee's beneficiary upon the employee's death, after the beneficiary submits proof of death and Unum approves the claim. AR 352, 1083. A separate AD&D benefit is available to the beneficiary if an "accidental bodily injury" results in the covered employee's death, subject to a number of exclusions. AR 361, 1094. "Accidental bodily injury" is defined in both Group Policies as "a bodily injury that is the direct result of an accident and not related to any other cause." AR 371, 1105.

In order to receive an AD&D benefit, a claimant or his or her authorized representative must provide "proof of claim," or evidence showing, among other things, the cause of death or other covered loss. AR 339, 1063. The Group Policies also provide that "[i]n some cases, [the claimant] will be required to give Unum authorization to obtain additional medical and non-medical information as part of [the] proof of claim" and that "Unum will deny [the] claim if the appropriate information is not submitted." AR 339, 1063. Finally, the Group Policies also set forth a number of "exclusions," or situations in which a participant or beneficiary is not entitled to AD&D benefits. AR 364–65, 1098. As relevant here, no AD&D benefits are payable for losses "caused by, contributed to by, or resulting from" the following:

- "the use of any prescription or non-prescription drug . . . unless used according to the prescription or direction of [a] physician (the "drug exclusion");

- "an attempt to commit or commission of a crime" (the "crime exclusion"); or

- "disease of the body" (the "disease exclusion").

AR 365, 1098.

**C.    November 27, 2019 accident**

Mr. Lohse died in a motor vehicle accident on November 27, 2019, at around 12:43 a.m. AR 444. Texas Department of Public Safety Trooper Jake Boyd investigated and prepared a Texas Peace Officer Crash Report. AR 444–47, 488. According to the report, the crash occurred on US Highway 259, a two-way, straight, level, undivided roadway with a center stripe or divider. AR 445, 454. The weather was clear, and the roadway surface was dry. AR 444–45, 454. The report explained that Mr. Lohse's vehicle (identified as "Unit #3") was traveling south in the northbound lane, that another vehicle ("Unit #1") swerved to miss him, and that Mr. Lohse's car collided with the other driver's trailer ("Unit #2") and then struck several trees:

> Unit #1 and its towed Unit #2 (fabrique par Load Trail) were traveling north on US 259. Unit #3 was traveling south on US 259 in the north bound lane. As Unit #3 was approaching closer, driver of Unit #1 took evasive action and swerved to the left to avoid a head on collision. Unit #3 struck Unit #2 in the right back quarter area with its right distributed. After impact Unit #1 and its towed Unit #2 traveled into a side skid off the roadway into the west ditch. As Unit #1 and its towed Unit #2 entered the ditch, Unit #2 swung to the left striking Unit #1 in the left back quarter area also causing Unit #2 cargo to shift and fall off Unit #2. After impact Unit #1 came to rest facing north in the south bound lane of US 259. After impact Unit #2 came to rest facing northeast halfway in the west ditch and the south bound lane of US 259. After impact Unit #3 traveled into the east ditch striking several trees with its front left and undercarriage area before coming to rest facing southeast. Driver of Unit #3 was pronounced deceased on scene. Autopsy results pending. During the investigation, Unit #3 was displaying the wrong license plate (AR-CZ361436).

AR 445 (capitalization removed). The officer noted that Mr. Lohse had several prescription drugs in the car and that "[i]t was later discovered that [Mr. Lohse] was diagnosed with narcolepsy." AR 445.

Mr. Lohse was pronounced dead at the scene. AR 445. The driver of the other car survived, apparently uninjured. AR 445. In the investigator's opinion, the factors that contributed to the crash were that Mr. Lohse was driving on the "wrong side-not passing" and that he was "fatigued

or asleep." AR 447, 454, 623. Illness was listed as a possible contributing condition. AR 447, 454, 623. After an autopsy, the medical examiner concluded that Mr. Lohse died from blunt force head trauma. AR 148. The toxicology report found that he had a number of prescription and potentially nonprescription drugs in his femoral blood. AR 150.

**D.    Unum's approval of Plaintiff's claim for life benefits**

Unum received Plaintiff's claim for life and AD&D benefits under both policies on or around February 5, 2020. AR 431. On February 14, the Unum benefits specialist handling the claim, Carol Dunham, informed Plaintiff that Unum approved his request for life benefits under the Basic Group Policy in the full amount of $42,000 plus interest. AR 506. On March 18, Ms. Dunham sent Plaintiff a follow-up letter stating that Unum had approved Plaintiff's claim for life benefits under the Supplemental Group Policy in the full amount of $100,000 plus interest. AR 663.

**E.    Unum's investigation of Plaintiff's AD&D claim**

In her February 14, 2020 letter to Plaintiff awarding him life benefits under the Basic Group Policy, Ms. Dunham informed Plaintiff that Unum needed additional information to complete its evaluation of his AD&D claim. AR 506–08. In particular, Unum noted that it had requested and not yet received medical examiner reports. AR 508. Also, Unum requested that Plaintiff provide an authorization form permitting the release of medical and other information, all legal documents giving authority to release Mr. Lohse's records, and a certified copy of the death certificate. AR 508. The same day (and apparently before receiving Ms. Dunham's letter), Unum received a fax containing a signed authorization form and copies of the crash report, autopsy report, and death certificate. AR 140–51.

1.    **Ms. Dunham obtained a medical review from Nurse Webb**

On February 17, 2020, having received the autopsy report, crash report, and death certificate, Ms. Dunham requested a consultation with a nurse to help her evaluate the file—specifically, the potential applicability of the drug and disease exclusions. AR 622.

In response to Ms. Dunham's request, Registered Nurse Marnie Webb reviewed the file and responded with a written report on February 19, 2020. AR 622–25. Nurse Webb examined the autopsy report, crash report, and death certificate. AR 623. She also reviewed Mr. Lohse's pharmacy records. AR 623. Nurse Webb noted medications prescribed to Mr. Lohse were found in the vehicle, including amphetamine-dextroamphetamine, clonazepam, aripiprazole, and promethazine with codeine, and toxicology results tested positive for promethazine, benzodiazepines, codeine, hydrocodone, marijuana/cannabinoids, and amphetamine. AR 623.

Ms. Webb examined the drugs that the toxicology report identified in Mr. Lohse's femoral blood. She opined that "the available medical information does not support that promethazine with codeine was taken in accordance with the last known prescription or typical dose." AR 623. She also concluded that "the available medical information does not support that hydrocodone was taken in accordance with physician direction." AR 624. In response to Ms. Dunham's query about whether a disease of the body caused, contributed to, or resulted in Mr. Lohse's death, Nurse Webb stated as follows:

> The police reported the insured was diagnosed with narcolepsy and concluded that "fatigued or asleep" contributed to the accident. Narcolepsy is a disease that can result in excessive daytime sleepiness or sudden attacks of sleep, which could explain the accident as opined by the police; however, narcolepsy cannot be confirmed by autopsy and toxicology. Additional medical information regarding whether the insured's narcolepsy symptoms were controlled with mediation (such as the amphetamine identified on toxicology) or uncontrolled would be beneficial for further assessment of this if deemed necessary by the AD&D BS.

AR 624–25.

12

**2.      Ms. Dunham sought legal advice from Mr. Flynn**

Ms. Dunham next turned to Unum legal counsel Dan Flynn for assistance regarding Plaintiff's claim. On February 20, 2020, she asked whether he believed it would be appropriate to conclude that Mr. Lohse's death was not accidental under the policy and "was contributed to by both prescription not taken in accordance with the prescription and police indicating that narcolepsy ( a disease) contributed to the accident" or whether more information would be needed regarding Mr. Lohse's narcolepsy to determine if the disease exclusion applied. AR 1137. Ms. Dunham stated in the inquiry that Mr. Lohse "died from blunt force head trauma in mva, he was the driver of a vehicle traveling south in the northbound lane than struck another vehicle, left the roadway and struck several trees." AR 1137. Mr. Flynn responded on February 21 that, "[w]hile there may already be sufficient evidence to assert the drug exclusion, I recommend attempting to get more information about [Mr. Lohse]'s narcolepsy to determine if the disease exclusion would apply." AR 1137.

**3.      Unum received additional medical records**

After receiving Mr. Flynn's response, Ms. Dunham sent another letter to Plaintiff on February 21, 2020. AR 631–32. She requested that he complete a form listing Mr. Lohse's treating physicians and other healthcare providers and facilities. AR 633–34. On February 27, 2020, Plaintiff faxed Unum a signed authorization form and copies of the autopsy report and death certificate. AR 637-47. On March 3, Plaintiff advised Unum via telephone that he did not have information regarding Mr. Lohse's physicians because he lived in another state and did not have access to that information. AR 648.

On March 19, 2020, Ms. Dunham informed Plaintiff that Unum was seeking medical records from two of Mr. Lohse's treating providers: family practitioner Dr. Patrick Greenburg and

Nurse Practitioner Tonile Pounds. AR 215. Ms. Dunham explained that Unum would need an authorization form signed by Mr. Lohse's wife to obtain these records. AR 215. On March 27, Plaintiff sent Unum the signed form. AR 214. On March 30, Unum received records from Nurse Practitioner Pounds' practice reflecting that Plaintiff had told both her and PA Jerry Browning that he was having trouble sleeping and insomnia in early June 2018 following the unexpected death of his father. AR 681, 683. Nurse Practitioner Pounds discussed sleep hygiene with Plaintiff and advised him to take medication until his sleep cycles improved. AR 682.

After multiple requests, Unum received records from Dr. Greenburg on May 22, 2020. AR 714–823. The records, which date from December 12, 2017 to August 19, 2019, reflect ongoing sleep issues. During each of the eight office visits in this period, Dr. Greenburg listed "primary insomnia" as the first item on Mr. Lohse's "problem list." AR 713, 723, 737, 749, 762, 778, 791, 807. In a record dated December 12, 2017, Dr. Greenburg noted he had reviewed 2013 sleep study results and that Plaintiff had PLMD (periodic limb movement disorder). AR 718, 722.

Ms. Dunham submitted the new records to Nurse Webb and requested her opinion on whether they supported applying the disease exclusion. AR 841. Nurse Webb responded on May 28, 2020. As to the disease exclusion, she explained that the medical records were still inconclusive as to whether Mr. Lohse had narcolepsy:

> Per review of additional [medical records] received, . . . there is documentation in Dr. Greenburg's records of an ongoing diagnosis of primary insomnia from at least 11/27/17 to 8/19/19 and in Express Care records of an acute episode of trouble sleeping when his father died for which he was seen on 6/7/18 and prescribed a 30-day supply of Pamelor (a med that can be used for ADHD, anxiety and depression, and insomnia). There was no further report of trouble sleeping at the 7/20/18 [office visit] with Dr. Greenburg and insomnia was noted as stable. There was no documentation of a diagnosis of narcolepsy nor were there reports of narcolepsy symptoms, such as excessive daytime sleepiness, cataplexy, disrupted nighttime sleep, sleep paralysis, or hypnagogic (while falling asleep) or hypnopompic (when waking up) hallucinations. . . .

14

\* \* \*

> In summary, there are no [medical record]s for review between 8/19/19 and his death on 11/27/19; however, the available medical information does not support that narcolepsy or any other disease of the body contributed to the insured's death.

AR 842.

However, Nurse Webb also noted additional information regarding Mr. Lohse's prescriptions and summarized as follows regarding the drug exclusion:

> The additional [medical record]s further support that promethazine-codeine and hydrocodone were not taken in accordance with physician direction, as these meds were not prescribed as of the last available [office visit notes] and the insured had been advised in the past not to take these medications at the same time.

AR 842.

On June 1, 2020, Mr. Flynn provided his legal opinion that there was sufficient evidence to assert the drug exclusion. AR 1140. Based on Nurse Webb's medical review of the submitted medical evidence, Mr. Flynn did not recommend asserting the disease exclusion based on narcolepsy. AR 1140.

### 4.    Ms. Dunham sent a letter explaining the drug exclusion applied ("First Determination Letter")

Based on the foregoing, Ms. Dunham sent a letter to Plaintiff on June 2, 2020 explaining that AD&D benefits were not payable because Mr. Lohse's death was caused by his traveling in the wrong direction of the highway and hitting another vehicle along with not taking prescription medications according to the prescription or direction of his physician. AR 229–33. Ms. Dunham's First Determination Letter explained that Plaintiff could appeal the decision and provide additional information. AR 232–33.

**F.    Plaintiff appealed and submitted new evidence**

On June 11, 2020, Ms. Dunham spoke with Plaintiff's aunt, who indicated that additional pharmacy records existed relating to the medications listed in Ms. Dunham's June 2 letter. AR 221. Ms. Dunham responded that the information could be submitted with an appeal of Unum's decision. AR 221.

After a number of agreed extensions of deadlines, Plaintiff appealed Unum's decision through counsel by way of a letter dated February 9, 2021. AR 278–79. Plaintiff's counsel noted that in the June 2, 2020 letter of denial, Unum denied the AD&D claims due to Mr. Lohse "traveling in the wrong direction of the highway and hitting another vehicle along with not taking prescription medications according to the prescription or direction of his physician." AR. 278. Counsel asked that Unum reconsider its denial for two reasons: (1) Mr. Lohse "was taking his prescriptions according to the prescription and/or at the direction of his physicians; and (2) Jay Lohse's narcolepsy was the singular cause of the accident that resulted in his death." AR 279.

As to the first reason, Plaintiff's counsel noted that Unum's pharmacy report was incomplete, and he provided additional pharmacy records from July 27 to November 27, 2019. AR 279, 283–87. The records, he wrote, indicated that Mr. Lohse had been prescribed hydrocodone/acetaminophen twice between July 27 and November 27 and promethazine with codeine on November 14, 2019 and November 26, 2019, one day before his death. AR 280–81. Nurse Webb did not have this information when she performed her analysis. AR 281. Specifically, Plaintiff's counsel explained as follows:

> [T]he findings of Ms. Webb do not take Jay Lohse's two recent refills of hydrocodone/acetaminophen, that call for him to take one tablet by mouth four times daily, into consideration. . . . Thus, Jay Lohse was taking his hydrocodone/acetaminophen in accordance with the prescriptions and at the direction of the physician.

* * *

In Ms. Webb's clinical findings, she fails to take into account the two additional prescriptions that Jay Lohse was prescribed. Because she did not have the additional information, she failed to take into account that his two recent prescriptions directed Jay Lohse to take 5-10 mls by mouth every four hours as needed for cough. On the day of the incident, Jay Lohe could have taken up to seven 10 mg doses of promethazine with codeine and doing so would be in accordance with the prescription and at the direction of his physician. . . .

AR 280-81.

Regarding the second reason, Plaintiff's counsel stated as follows:

Jay Lohse was diagnosed with narcolepsy by Dr. Edward H. Ortiz in 2018. A copy of Jay Lohse's medical records from Dr. Ortiz are attached hereto and marked as Exhibit C. These records indicate that Jay Lohse's symptoms were consistent with narcolepsy and such a finding was consistent with Jay's daytime sleepiness and cataplexy. Cataplexy is a sudden, brief loss of voluntary muscle tone where one's muscles suddenly go limp or significantly weaken without warning.

Additionally, in the accident report, the responding officers concluded that Jay being "fatigued" or "asleep" were factors that contributed to the accident. Such findings are consistent with Jay Lohse's Narcolepsy diagnosis. Thus, Jay Lohse's narcolepsy was the singular cause of the accident and the cause of his death was severe, lethal head trauma.

As evidenced in the records from Harp's Pharmacy and Walgreen's pharmacy, it is established that Jay Lohse had prescriptions for both hydrocodone/acetaminophen and promethazine with codeine that were filled between July 27, 2019 and November 27, 2019. According to the records, Jay Lohse was taking both medications in accordance with the prescription and at the direction of his physicians. Additionally, Jay Lohse was diagnosed with narcolepsy as early as 2018 and had been living with the condition up until the time of his death. Thus, Jay Lohse's narcolepsy was the disorder that led to the fatal accident Jay Lohse was involved in on November 27, 2019.

AR 281-82.

The attached office visit notes from Dr. Ortiz dated January 25, 2018 (AR 281, 288–91) explain that Mr. Lohse's "symptoms and sleep study are consistent with [n]arcolepsy" and that "[o]ther causes of daytime sleepiness have been ruled out." AR 291. According to Dr. Ortiz's notes, Mr. Lohse's ongoing sleep issues began at least as early as 2015. AR 289. They also reveal

17

that he had been suffering from "chronic hypersomnolence" and "ha[d] been sleepy for many years." AR 289. Mr. Lohse was also being treating for periodic limb movement syndrome, and he "report[ed] frequent episodes of bilateral leg weakness with emotion lasting <2 minutes without [loss of control]." AR 289.

### G.    Unum determined the disease and crime exclusions applied

Because the appeal included new information, the appeals department returned the file to Ms. Dunham for further consideration on February 11, 2021. AR 295.

### 1.    Upon further consideration, Nurse Webb concluded the record no longer supported the drug exclusion but supported the disease exclusion

Ms. Dunham asked Nurse Webb to review the new evidence. AR 953. She had two questions: (1) whether the new medical records supported a finding that Mr. Lohse suffered from narcolepsy and, if so, how narcolepsy might affect driving ability; and (2) whether the records showed the use of any prescription or non-prescription drug or other substance other than according to the prescription or direction of a physician. AR 953. Nurse Webb addressed the second question first.

After examining the updated prescription information and considering the toxicology report, she concluded that it was possible that Mr. Lohse's hydrocodone level "could have been achieved at the prescribed dose. Therefore, it is possible that this med[icine] was taken in accordance with physician direction." AR 954. Similarly, she wrote that "the insured's promethazine level is within a possible range based on the updated information." AR 955. Regarding codeine individually, Nurse Webb sated as follows:

> Codeine has a relatively short half-life at 1.2–3.9 hours; therefore, significant accumulation in the blood to the level seen in the insured, even with repeated doses, would not be expected. However, there are reported individuals that may metabolize codeine more rapidly resulting in higher peak levels. Given this, it cannot be

determined with medical certainty that codeine was not taken in accordance with physician direction given the updated [prescription] information.

AR 955.

Turning to the disease exclusion, Nurse Webb explained that the records indicate that Mr. Lohse's symptoms were consistent with narcolepsy and with Mr. Lohse's sleepiness and cataplexy, which Nurse Webb explained is a "sudden, brief loss of voluntary muscle tone where one's muscles suddenly go limp or significantly weaken without warning." AR 955. She noted Dr. Ortiz was treating Mr. Lohse in early 2018 for chronic hypersomnolence/suspected narcolepsy, insomnia, and periodic limb movement syndrome. AR 955. She further pointed out that Dr. Ortiz noted Mr. Lohse's symptoms and sleep study were consistent with narcolepsy and other causes of daytime sleepiness had not been ruled out and that Dr. Ortiz had recommended a trial of Xyrem to treat daytime sleepiness and cataplexy. AR 955 (further noting pharmacy records did not show any prescriptions for Xyrem). Nurse Webb summarized as follows:

> As noted in [my] previous review, narcolepsy is a disease that can result in excessive daytime sleepiness or sudden attacks of sleep and cataplexy (brief periods of muscle weakness). The additional medical information provided by Mr. Keil supports that the insured had ongoing symptoms of fatigue, daytime somnolence (sleepiness) and cataplexy6 as of 1/25/18, and there are no subsequent [medical record]s to support that his condition had improved as of the date of the accident. It is reasonable that the reported symptoms of narcolepsy, which is disease of the body, could have caused the accident, as opined by [Plaintiff's counsel] and the police.

AR 955.

## 2.    Mr. Flynn provided further legal analysis

Based on the foregoing, on February 22, 2021, Mr. Flynn provided a legal opinion to the effect that the disease exclusion provided a primary basis for denial, with the crime exclusion as a secondary basis:

> I have been asked for legal advice concerning [the] disease of the body and prescription/non-prescription exclusions.

> As we discussed, given the attorney's position that narcolepsy caused the insured's accident, the updated medical records, the police report, and the most recent medical review, in my opinion it would be reasonable and appropriate to assert the disease of the body exclusion in this claim. While the updated medical information and analysis no longer support[] asserting the prescription/non-prescription exclusion, in my opinion it would be appropriate to assert the crime exclusion as a secondary basis for an adverse decision, as the insured was driving recklessly on the wrong side of the road when the accident occurred, which is a violation of the Texas Traffic Code.

AR 1154.

### 3.    Ms. Dunham sent a new letter explaining why the disease and crime exclusions applied ("Second Determination Letter")

In light of the record, including the new information Plaintiff's counsel submitted as well as Nurse Webb's and Mr. Flynn's opinions, Ms. Dunham prepared a letter explaining that the new information did alter Unum's analysis but not its ultimate decision. AR 984–87. The letter, dated March 3, 2021, stated that, "[b]ased on the new information provided, we are in agreement that Mr. Lohse did have current prescriptions for hydrocodone/acetaminophen and promethazine with codeine." AR 985. Ms. Dunham included the following analysis describing why the disease exclusion was appropriate:

> In your appeal you indicate[d,] "Jay Lohse was diagnosed with narcolepsy by Dr. Edward H. Ortiz in 2018." The records provided do support his diagnosis. According to the medical review, "These records indicate that Jay Lohse's symptoms were consistent with narcolepsy and such a finding was consistent with Jay's sleepiness and cataplexy. Cataplexy is a sudden, brief loss of voluntary muscle tone where one's muscles suddenly go limp or significantly weaken without warning." You further noted that the police had concluded that his being "fatigued[] or asleep" were factors that contributed to the accident.
>
> Our medical consultant indicates that narcolepsy is a disease that can result in excessive daytime sleepiness or sudden attacks of sleep and cataplexy. The additional records provided support that he had ongoing symptoms of fatigue, daytime somnolence (sleepiness) and cataplexy as of January 25, 2018 with no subsequent medical records to support that this condition had improved as of the date of the accident. Therefore, it is reasonable to conclude that the reported

> narcolepsy symptom, a disease of the body, could have caused the accident as both you and the police indicate.

AR 985.

She also explained that the crime exclusion applied: "Mr. Lohse was driving on the wrong side of the road when the accident occurred, [so] it is reasonable that this recklessness also contributed to his death. Driving on the wrong side of the road is a violation of the Texas Traffic Code." AR 985. She concluded that Mr. Lohse's "death was not considered accidental, as defined in the policy, and was caused by and contributed to by both a disease of the body and the commission of a crime." AR 985. She explained that Mr. Lohse had the right to appeal. AR 986.

## H.    Plaintiff exercised his right to appeal

Plaintiff, through counsel, exercised his appeal right on May 21, 2021. AR 998–1001. He asserted two arguments. First, regarding the disease exclusion, he argued that Mr. Lohse's "narcolepsy was *not* the cause of his death, the accident was the cause of death." AR 999 (emphasis original). Counsel asserted Mr. Lohse was involved in an accident, which caused, "severe, lethal head trauma" that caused—or brought about—his death. AR 1000. According to counsel, Mr. Lohse's death was unequivocally caused by the accident on November 27, 2019, and in Unum's "haste to deny Mr. Lohse's benefits, it fails to consider that Mr. Lohse could have had a narcoleptic episode—survived—and still made it home to celebrate Thanksgiving with his family." AR 1000.

Second, as to the crime exclusion, counsel argued that Mr. Lohse was not intending to commit or committing a crime. After defining "accidental" as "happening by chance, unintentionally, or unexpectedly," counsel stated the facts show Mr. Lohse was involved in an accident. AR 1000. According to counsel, there "is no showing of intent in any fact or documentation establishing that Mr. Lohse intended to commit a crime much less a traffic violation of driving left of center/crossing center line. Therefore, there was no crime attempted or

21

committed." AR 1000. Plaintiff submitted no additional medical records or other evidence with this appeal.

## I.    Unum's appeals specialist determined Ms. Dunham's decision was correct

Unum assigned the appeal to Lead Appeals Specialist Maureen Turner, who had no prior involvement with the claim. AR 316. On May 27, 2021, she asked Mr. Flynn to review counsel's May 21 appeal letter and provide his opinion. AR 1144.

Mr. Flynn began by noting that the governing jurisdiction for the Group Policies was Maine, so he considered First Circuit precedent.[3] AR 1144. He analogized the case to, and distinguished it from, a First Circuit case, *Vickers v. Boston Mutual Life Insurance Co.*, 135 F.3d 179 (1st Cir. 1998). AR 1144–45. The *Vickers* court held that a fatal crash caused by a driver's heart attack was an "accident" under the specific terms of the particular AD&D policy at issue. AR 1144. However, Mr. Flynn observed that the Group Policies' disease exclusions were more expansive than the language at issue in *Vickers*:

> The [Group Policies] also contain[] an exclusion for any accidental losses "caused by, contributed to by, or resulting from . . . disease of the body." In *Vickers*, the court held that a similar disease exclusion would not apply to an insured who suffered a heart attack while driving that resulted in his death from blunt force trauma. *Id*. This fact pattern is very similar to the present claim and argues for payment of the benefits. However, there is a key distinction in policy language that leads me to conclude that the disease of the body exclusion is applicable in this claim. In *Vickers*, the policy only excluded accidents "caused by" or "resulting from" disease or bodily infirmity. Conversely, the Unum [Group Policies] include[] the additional "contributed to by" language that broadens the scope of the exclusion. The "contributed to by" language counters the attorney's argument that the blunt force trauma caused the death because it means that Unum does not have to prove disease caused the death, only that it contributed to the death occurring. Based on this distinction in policy language[,] in my opinion the exclusion would apply.

---

[3] The fact that the Group Policies choose Maine law, to the extent no preempted by ERISA, does not alter the Court's reliance below on ERISA federal common law as interpreted by the Fifth Circuit.

AR 1144–45. Mr. Flynn also opined that if Mr. Lohse's narcolepsy—contrary to counsel's own

argument—had somehow not contributed to the loss, then the crime exclusion would apply:

> Concerning the crime exclusion, the attorney is correct that if the insured's crossing of the center line was caused by a narcoleptic episode, he would be excused from criminal liability and that the crime exclusion should not apply. However, if the attorney were to argue that there was no connection between the narcolepsy and the MVA, then there would be no basis for excusing the criminal act of driving the wrong direction. See Tex. Transp. Code § 545.051. Accordingly, if the claimant concedes that a narcoleptic episode caused the MVA, then the disease exclusion would apply; if he does not concede this, then the crime exclusion would apply.

AR 1145. Ms. Turner agreed with Mr. Flynn's opinion. AR 1027.

By letter dated June 8, 2021, Ms. Turner informed Plaintiff's counsel that Unum was

upholding the decision based on the disease of the body exclusion and commission of a crime

exclusion:

> A review of the available medical data confirms Mr. Lohse's medical history includes a diagnosis of narcolepsy. A January 25, 2018 office visit note with Dr. Edward Ortiz (Pulmonology, Sleep Medicine) documented that Mr. Lohse's symptoms and sleep study are consistent with narcolepsy, and other causes of daytime sleepiness had been ruled out. There are no subsequent medical records to support that his condition had improved as of the date of the accident.
>
> Narcolepsy is a disease that can result in excessive daytime sleepiness or sudden attacks of sleep and cataplexy (brief periods of muscle weakness). It is reasonable that Mr. Lohse's reported symptoms of narcolepsy, which is disease of the body, caused, contributed to or resulted in the accident that caused Mr. Lohse's death. This conclusion is consistent with the police report as well as your statement in your February 09, 2021 letter that "Jay Lohse's narcolepsy was the singular cause of the accident that resulted in his death".
>
> In your [] May 21, 2021 letter, you stated that Mr. Lohse's narcolepsy was not the cause of his death, the accident was the cause of his death. The group life and accidental death and dismemberment insurance policy issued to Central Research, Inc. provides an accidental death benefit when death is the direct result of an accident and not related to any other cause. The policy further states that the plan does not cover any accidental losses caused by, contributed to by, or resulting from disease of the body.
>
> The available evidence contained in the claim file supports that Mr. Lohse's narcolepsy, which is a disease of the body, contributed to his death occurring.

Therefore, the referenced policy exclusion is applicable and accidental death benefits are not payable.

Concerning an attempt to commit or commission of a crime exclusion, you are correct that if Mr. Lohse's crossing the center line was caused by a narcoleptic episode, he would be excused from criminal liability and th[e] crime exclusion would not apply. However, if you were to argue that there was no connection between the narcolepsy and the motor vehicle accident, then there would be no basis for excusing the criminal act of driving the wrong direction.

In summary, we acknowledge that Mr. Lohse's manner of death is listed as "accident" on the death certificate. However, accidental death benefits are not payable under the above referenced policy when an exclusion to coverage is applicable.

Based on our review, we have concluded that Mr. Lohse's death was caused by, contributed to by, or resulted from his narcolepsy, which is a disease of the body. Therefore, application of the referenced policy exclusion to coverage is applicable, and the decision to deny accidental death benefits for Mr. Lohse was appropriate.

AR 1030–31.

## IV. ANALYSIS

### A.    The issues

Plaintiff contends that Unum wrongfully denied AD&D benefits and breached its fiduciary duty and accordingly requests that the Court grant Plaintiff's motion and award Plaintiff damages in the amount of Mr. Lohse's AD&D benefits, attorneys' fees, and costs. Plaintiff takes issue with Unum's procedure in administering his claim, arguing Unum improperly changed its reasons for denying Plaintiff's claim. Although Plaintiff urges the Court to focus on the reason contained in the First Determination Letter (drug exclusion), Plaintiff contends Unum did not correctly apply either the disease exclusion or the crime exclusion in the Second Determination Letter.

Unum argues it complied with ERISA, asserting that when it withdrew the drug exclusion and asserted the disease and crime exclusions, "it did so in a brand new first-level decision and

gave Plaintiff the opportunity to appeal that decision." Dkt. No. 25 at 2. Focusing on the two reasons stated in the second denial, Unum maintains that it correctly applied the disease exclusion, and alternatively the crime exclusion, contained in the AD&D policy, and Plaintiff cannot assert a breach of fiduciary duty claim under settled Fifth Circuit law. As such, Unum not only opposes Plaintiff's motion, but has also filed its own motion for summary judgment arguing that the Court should deny Plaintiff's claims under §§ 1132(a)(1)(B) and (a)(3).

## B.    Plaintiff's claim under § 1132(a)(1)(B)

### 1.    Unum's alleged changing rationale

There is no dispute that Unum initially asserted the drug exclusion, later changed its reasoning after receiving new evidence, and asserted the disease and crime exclusions in the final administrative determination. However, Plaintiff asserts nothing in the policies or federal case law allows Unum to change its reasons for denial. Dkt. No. 23 at 6. Therefore, Plaintiff urges the Court to only address Unum's first denial. *Id.*; *see also* Dkt. No. 27 at 4 ("This Court should find that Unum forfeited its right to raise new reasons for denial as they were not set forth in the first denial" even though Unum had sufficient information to have raised both the disease and crime exclusions along with the drug exclusion in the first denial.).

Asserting "[s]ome courts have held that the administrator waived defenses to coverage not articulated to the insured during the claims review process when the administrator had sufficient information to have raised those defenses if it so chose," Plaintiff argues Unum should be held to the reasoning in the First Determination Letter and barred from relying on the disease and crime exclusions asserted for the first time in the Second Determination Letter. Dkt. No. 28 (quoting *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 131 (1st Cir. 2004) (citing, among other cases, *Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir.1991) (defining waiver as the "voluntary

or intentional relinquishment of a known right.")). In *Glista*, the First Circuit, noting that Unum failed to raise the Symptoms Clause at <u>any</u> time in the claims review process even though it had the burden, obligation, and opportunity to do so, held Unum to the basis that it articulated in its internal claims review process for denying benefits, i.e., the Treatment Clause. *Id.* at 132. Here, Unum <u>did</u> raise the disease and crime exclusions during the claims review process. Therefore, the Court does not find Unum waived or forfeited its right to raise the disease and crime exclusions which were articulated in its Second Determination Letter.

As a reviewing court, the Court only reviews the administrator's final decision terminating the claimant's benefits. *Corry v. Liberty Life Assur. Co. of Bos.*, 499 F.3d 389, 399 n. 13 (5th Cir. 2007); *see also Bunner v. Dearborn Nat'l Life Ins. Co.*, No. H-18-1820, 2019 WL 1024353, at *3 (S.D. Tex. Jan. 31, 2019) ("Under ERISA, the court's job is to review a final decision of the plan administrator, not to referee the administrative process for the parties."), *report and recommendation adopted*, No. CV H-18-1820, 2019 WL 1026263 (S.D. Tex. Mar. 4, 2019), *aff'd*, 37 F.4th 267 (5th Cir. 2022). As urged by Unum, its First Determination Letter is not the final decision before the Court. Therefore, the Court considers the reasons contained in Unum's Second Determination Letter.

Relatedly, Plaintiff asserts Unum's shifting justification for changing its reason for denial was procedurally unreasonable. Dkt. No. 22 at 19. According to Plaintiff, Unum first denied Plaintiff's claim under the drug exclusion—without even obtaining all of the necessary pharmacy records—and also referenced that an additional factor was traveling on the wrong side of the road—without providing a provision of the policy or a specific statute in the Texas Transportation Code that supported that decision; then, "when confronted with contradictory evidence, Unum shifted the ball and came up with two new reasons to attempt to deny payment of contractual

26

accidental death benefits," thereby stripping Plaintiff of a full and fair review. *Id.* at 20-21. Relying on *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389 (5th Cir. 2006), Plaintiff asserts Unum's shifting justification "effectively meant that the plan administrator's specific reason. . . was never reviewed at the administrative level, and therefore violated § 1133(2)." *Id.* at 20.

Plaintiff is correct that inconsistent reasons for benefit denials may be evidence of procedural unreasonableness. *Hayes v. Dearborn Nat'l Life Ins. Co.*, 744 Fed. Appx. 218, 223 (5th Cir. 2018). A plan administrator's "changing its basis for denial of benefits" prevents both the applicant and the reviewer from contemplating the specific reasons for denial. *Id.* (citation omitted). Accordingly, where a plan administrator repeatedly moves the ball to avoid a full and fair review, the court will vacate a denial of benefits for procedural unreasonableness. *Id.* (citation omitted).

The record here, however, does not show Unum moved the goal to prevent a full and fair review. In the First Determination Letter dated June 2, 202, Ms. Dunham explained that the drug exclusion applied, summarizing that Mr. Lohse's "death was not considered accidental, as defined in the policy, and was contributed to by both his driving in the wrong direction on a highway and not taking prescription medications as prescribed by a physician's direction." AR 229, 231.

Plaintiff appealed the First Determination Letter, submitting additional pharmacy records and evidence from Dr. Ortiz showing Mr. Lohse had narcolepsy and explaining that Mr. Lohse's "narcolepsy was the singular cause of the accident that resulted in his death." AR 278-79. In response to this new evidence and argument, Unum's appeals department returned the file to the claims department so Ms. Dunham could reevaluate it in light of the new evidence submitted by Plaintiff. AR 295, AR 931 (February 11, 2011 letter from Unum noting that if Plaintiff's claim was denied for another reason, Plaintiff would be given new appeal rights).

Following Plaintiff's appeal and submission of new evidence, Unum sent an updated letter on March 3, 2021, explaining that AD&D benefits were still not payable due to a different exclusion (disease of the body). The Second Determination Letter also stated that benefits are not payable when the loss was caused by contributed to or resulted from an attempt to commit or commission of a crime. AR 984.

Importantly, the Second Determination Letter contained "new appeal rights." AR 296-98, 979-83. On March 5, 2021, Lead Appeals Specialist Shane Knox from Unum called Plaintiff's attorney and explained that a "new decision ha[d] been communicated . . . and that he ha[d] been provided a new appeal period." AR 990. Plaintiff's counsel responded that he had not yet seen the "new decision letter" and "would like to review this information before the appeal review begins." *Id.* Knox confirmed that he would send Plaintiff's attorney a letter outlining his intention to appeal after he had an opportunity to review the new decision and that once the appeal was received, Unum would begin an independent review. *Id.*, AR 992-93 (March 5, 2021 "follow up" letter).

After carefully reviewing the administrative record, the Court finds that the bases for Unum's decision changed because Plaintiff submitted new information for Unum's consideration during the appeal review. *Wittmann v. Unum Life Ins. Co. of Am.*, No. CV 17-9501, 2019 WL 763509, at *23 (E.D. La. Feb. 21, 2019), *aff'd*, 793 Fed. Appx. 281 (5th Cir. 2019) (citing, among other cases, *Avena v. Unum Life Ins. Co. of Am.*, No. 13-5947, 2015 WL 1726173, at *4 (E.D. La. Ap. 14, 2015) (Milazzo, J.) ("Here too, the Court finds that Defendant gave thorough consideration to Plaintiff's claim. It had three physicians review Plaintiff's record, entertained an appeal, waited for Plaintiff to visit a neurosurgeon before deciding, and reached out to Plaintiff's treating physician to discuss Plaintiff's condition. This Court does not find any circumstance that suggests a higher likelihood that Unum's conflict affected the benefits decision.")). In administering

28

Plaintiff's claim, Unum obtained a medical review and sought advice from legal counsel. On appeal, Unum sought further medical review and legal analysis regarding the new evidence submitted by Plaintiff. Unum gave thorough consideration to Plaintiff's claim.

This case does not contain the "bait and switch tactic" presented in *Robinson*, the case relied upon by Plaintiff. *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 653 (5th Cir. 2009); *see also Robinson*, 443 F.3d at393-94 (finding Aetna did not substantially comply with § 1133 because it provided a new basis for terminating the claimant's benefits late in the process while foreclosing the claimant's ability to contest at the administrative level that new basis). Unlike in *Robinson*, any procedural errors here (e.g., that Unum did not obtain "critical pharmacy records" prior to its first decision and did not specifically cite Texas Transportation Code § 545.051) amount to mere technical noncompliance. As recognized by the Fifth Circuit in *Robinson*, "technical noncompliance with ERISA procedures will be excused so long as the purpose of section 1133 has been fulfilled." *Cooper*, 592 F.3d at 654 (quoting *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009) (quoting *Robinson*, 443 F.3d at 393)). "The purpose of section 1133 is 'to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial.'" *Id.* at 654-55 (quoting *Lafleur*, 563 F.3d at 154 (quoting *Schneider v. Sentry Long Term Disability*, 422 F.3d 621, 627–28 (7th Cir. 2005))). The purpose behind "mandating review of the specific ground for a termination [was to] encourag[e] the parties to make a serious effort to resolve their dispute at the administrator's level before filing suit in district court." *Id*. at 655 (quoting *Robinson*, 443 F.3d at 393).

In the present case, there can be no doubt that the purpose of § 1133 has been fulfilled. When Unum withdrew the drug exclusion and asserted the disease and crime exclusions, it did so in a new decision giving Plaintiff the opportunity to appeal. Thus, Plaintiff was able to challenge

Unum's second and final decision and obtain meaningful review of the reasons his claim for AD&D benefits was denied. When Plaintiff did so, Unum considered the "specific reasons" for its determination—the disease and crime exclusions as set forth in the Second Determination Letter— and upheld its determination based on those exact same reasons.

Plaintiff has cited no law stating that a claims administrator cannot provide a new rationale for a denial as the claim administration progresses. Indeed, in *Hayes v. Dearborn Nat'l Life Ins. Co.*, 744 Fed. Appx. 218 (5th Cir. 2018), a case cited by Plaintiff, the Fifth Circuit was unpersuaded that Dearborn National's changing reasons for denial of benefits was evidence of procedure unreasonableness. *Id.* at 223. Specifically, the court explained as follows:

> Here, the changing reasons for Dearborn National's denial of benefits did not prohibit, but instead provided evidence of, a "full and fair review." 29 U.S.C. § 1133. . . . For example, Dearborn National initially found insufficient evidence of physical disabilities but, upon receiving further information and referring the file to an independent consultant, accepted his physical limitations. Accordingly, Dearborn National referred the case for an independent employability analysis. That it was ultimately determined that he could perform seven occupations, and was therefore ineligible for additional benefits, does not render the process unreasonable.

*Id.*

Similarly here, the Court is unpersuaded by Plaintiff's assertion that Unum's changing reasons for denial of AD&D benefits is evidence of procedural unreasonableness. Instead, the changing reasons for Unum's denial provides evidence of a full and fair review.

2.    *De novo* review

a.    **Applicable law**

Plaintiff bears the burden to show by a preponderance of the evidence that he is entitled to benefits.[4] *Hodge v. Guardian Life Ins. Co. of Am.*, No. 4:20-CV-2088, 2021 WL 5142793, at *2 (S.D. Tex. Sept. 10, 2021), *report and recommendation adopted*, No. 4:20-CV-2088, 2021 WL 5143886 (S.D. Tex. Nov. 3, 2021); *see also Lebron v. Boeing Co*., No. CV H-18-3935, 2020 WL 444428, at *2 (S.D. Tex. Jan. 13, 2020) (under *de novo* review the court independently weighs the administrative record to determine whether the claimant has shown an entitlement to benefits), *report and recommendation adopted sub nom. Lebron v. Boeing Co. Emp. Health & Welfare Plan*, No. 4:18-CV-3935, 2020 WL 430964 (S.D. Tex. Jan. 28, 2020), *aff'd sub nom. Lebron v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, No. 20-20165, 2021 WL 1396574 (5th Cir. Apr. 13, 2021). That said, the insurer has the burden of proving an exclusion applies. *Holman v. Life Ins. Co. of N. Am.*, 533 F. Supp. 3d 502, 506 (S.D. Tex. 2021) (citing *Horton v. Reliance Standard Life Ins. Co*., 141 F.3d 1038, 1040 (11th Cir. 1998)).

"Interpretations of policy provisions in ERISA-regulated plans are governed by federal common law." *Krishna v. Life Ins. Co. of N. Am.*, No. 22-20516, 2023 WL 4676822, at *6 (5th Cir. July 21, 2023) (quoting *Talamantes v. Metro. Life Ins. Co*., 3 F.4th 166, 169 (5th Cir. 2021)).

---

[4] The Fifth Circuit has not directly addressed the standard for a claimant's burden of proof for a benefits denial under ERISA, but other circuits and district courts again provide guidance. *Gray v. Minnesota Life Ins. Co*., No. CV H-19-4672, 2021 WL 861298, at *2 (S.D. Tex. Mar. 8, 2021). On *de novo* review of a plaintiff's claim for benefits, "the standard is ... whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Id.* (quoting *Niles v. Am. Airlines, Inc.*, 269 Fed. Appx. 827, 833 (10th Cir. 2008); also citing *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 112–13 (1st Cir. 2017) ("[A]n ERISA beneficiary who claims the wrongful denial of benefits bears the burden of demonstrating, by a preponderance of the evidence, that she was in fact entitled to coverage."); *Hill v. Hartford Life & Accident Ins. Co.*, No. 1:08-CV-0754-CC, 2009 WL 10664970, at *7 (N.D. Ga. Sept. 16, 2009) ("The plaintiff must prove by a preponderance of the evidence that he is entitled to disability benefits within the meaning of the policy.")).

31

Federal common law rules of contract construction and interpretation incorporate ordinary rules of contract construction. *Id.* (citing *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 331 (5th Cir. 2014)). "When construing ERISA plan provisions, courts are to give the language of an insurance contract its ordinary and generally accepted meaning if such a meaning exists ... [o]nly if the plan terms remain ambiguous after applying ordinary principles of contract interpretation are we compelled to apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured." *Id*. (quoting *Talamantes*, 3 F.4th at 169). The court may consider analogous state law as a guide when determining the applicable federal common law. *Zurawin*, 2020 WL 5506588, at *5 (citing *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 252 (5th Cir. 2019)).

Finally, the policy at issue here is for accidental death benefits. In *Phillips v. Home Sec. Life Ins. Co.*, 632 F.2d 1302 (5th Cir. 1980) the Fifth Circuit noted that the district court must construe such policies very precisely:

> Insurance against death by accident is usually, as here, afforded for a small premium and the coverage is correspondingly narrow. The liability is guarded by carefully chosen words, and a court has no more right by strained construction to make the policy more beneficial by extending the coverage contracted for than it would have to increase the amount of the insurance.

*Holman v. Life Ins. Co. of N. Am.*, 533 F. Supp. 3d 502, 509 (S.D. Tex. 2021) (quoting *Phillips*, 632 F.2d at 1305 (quoting *Life & Cas. Ins. Co. of Tennessee v. Brown*, 213 Ga. 390, 99 S.E.2d 98, 100 (1957))) (noting in a footnote that the Fifth Circuit was not considering Texas law when it made this statement, but the "comment is consistent with state and federal decisions concerning Texas law construing such policies").

**b.      Plaintiff has met his burden of showing Mr. Lohse died due to an "accidental bodily injury"**

Unum's plan provides AD&D benefits to the beneficiary if an "accidental bodily injury" results in a covered loss, subject to a number of exclusions. AR 361, 1094. The burden is on Plaintiff to submit proof of loss establishing that the insured died due to an "accidental bodily injury." *Gray v. Minnesota Life Ins. Co*., No. CV H-19-4672, 2021 WL 861298, at *5 n. 8 (S.D. Tex. Mar. 8, 2021). "Accidental bodily injury" is defined as "a bodily injury that is the direct result of an accident and not related to any other cause." AR 371, 1105. Here, the immediate cause of Mr. Lohse's death is undisputed – blunt-force injuries from crashing into a tree after driving south in the northbound lane of a two-lane highway. Accordingly, Plaintiff has shown, subject to the policy exclusions, Mr. Lohse died due to a covered event.

However, it is unclear whether Unum is arguing that Mr. Lohse's accidental death falls within the scope of the Group Policies' definition of "accidental bodily injury." To the extent Unum does so, that argument is unpersuasive. In Texas and most other jurisdictions, coverage clauses which provide that an insured can only recover if the loss is "directly or independently" or "independently and exclusively" caused by an accident have been construed to preclude recovery where disease is a "concurrent proximate cause" of death. *Sekel v. Aetna Life Ins. Co*., 704 F.2d 1335, 1337 (5th Cir. 1983) (citing *Mut. Benefit Health & Accident Ass'n v. Hudman*, 398 S.W.2d 110, 115 (Tex. 1965); also citing 10 G. Couch, R. Anderson, & M. Rhodes, Couch on Insurance 2d, § 41:75 at 113–14 (rev. vol. 10, 1982); also citing 1B Appleman, Insurance Law & Practice § 393 at 64–73 (rev. vol. 1B 1981)). In other words, where policies provide that an accident must "directly and independently" be the cause of a loss, the general rule is that if disease is a concurrent proximate cause, the insurance company is not liable. *Id*. at 1342 (citing Couch, § 41:75 at 113–14 (stating that "[w]hen the facts are such that neither the accident nor the pre-existing disease can

be isolated as the proximate cause, and it is concluded that both combined or operated to produce the harm, the insurer is not liable").

The Court further finds instructive *National Life & Accident Insurance Co. v. Franklin*, 506 S.W.2d 765 (Tex.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.). In that case, the insured, who had a history of epileptic seizures, was found dead lying over the edge of the bathtub which was "virtually empty." *Id.* at 766. The examiner's report indicated accidental death by drowning and also that the deceased may have been having a seizure at or near the time of death. *Id.* The insurance policy covered losses resulting "directly and independently of all other causes, from bodily injuries effected solely through external, violent and accidental means," and contained an exclusionary clause prohibiting payment for losses that "result[ ] from or [are] contributed to by any disease or mental infirmity." *Id*. The court assumed that even if the insured's epilepsy caused him to lose consciousness and fall into the bathtub, it did not cause death by drowning. *Id.* at 767. The court explained, "[t]he epilepsy was merely a cause of a cause and was therefore too remote to bar recovery." *Id.*

That contrasts with *Hagen*, a case cited by Unum in its discussion on the disease exclusion, the Fifth Circuit, applying the arbitrary and capricious standard under ERISA, affirmed the district court's determination that Aetna's denial of Mrs. Hagen's claim for AD&D benefits was not an abuse of discretion. There, the policy provided that to qualify as an "accident" an event "must not be due to, or contributed by, an illness. . . ." and "injury" was defined as "[a]n accidental bodily injury that is the sole and direct result of . . . [a]n unexpected or reasonably unforeseen occurrence or event. . ." and "[a]n injury is not the direct result of illness."[5] *Hagen v. Aetna Ins. Co*., 808 F.3d

---

[5] Mr. Hagen fell in his home and fractured his right hip. *Hagen v. Aetna Ins. Co*., 808 F.3d 1022, 1025 (5th Cir. 2015). The doctors who examined Mr. Hagen at the hospital noted his extensive medical history and that he suffered from a number of ongoing health problems. *Id*. Mr. Hagen had surgery for his hip; although he initially seemed to be

1022, 1025 (5th Cir. 2015). The Fifth Circuit concluded there was sufficient evidence in the record to support Aetna's determination that Mr. Hagen's fall was due to or contributed to by (i.e., it was a least a concurrent cause) his illness and did not reach the other arguments regarding the cause of death. *Id.* at 1030.

Based on the foregoing, the Court finds Mr. Lohse's preexisting condition of narcolepsy was, at most, a remote cause that did "not materially contribute to the death or injury." *Mutual Benefit Health & Accident Association v. Hudman*, 398 S.W.2d 110 (Tex. 1965). The Court, having carefully reviewed the eight briefs in this case, the Administrative Record, and the applicable case law, finds Plaintiff has met his burden to show Mr. Lohse's death was an "accidental bodily injury" as defined in the Basic Group Policy (e.g., that it was the direct result of the car crash and not related to any other cause).

### c.    Unum has not met its burden of showing an exclusion applies

Based on the language of the policy exclusions, Unum has not met its burden of proving, by a preponderance of the evidence, that an exclusion bars recovery.

### i.    Unum's decision based on the disease exclusion

#### *Parties' assertions*

Unum asserts the Administrative Record conclusively proves that Unum's decision to apply the disease exclusion was correct, and therefore, Unum is entitled to summary judgment. Plaintiff asserts two reasons why Unum's decision is incorrect: (1) Unum has not established that Mr. Lohse had a disease of the body (specifically, narcolepsy); and (2) Unum has not established

---

recovering from surgery, he ultimately died a couple of weeks afterward. *Id.* Aetna denied Mrs. Hagen's claim for accidental death coverage because the fall was caused or contributed to by Mr. Hagen's overall poor health status and would be excluded under the terms of the policy. *Id.* at 1026. Thus, there were two possible bases for Aetna's denial of coverage: (1) that Mr. Hagen's fall was not an "accident" because it was caused or contributed to by his various illnesses; and (2) that his death was not a covered "loss" because it was not caused by injury from the fall, but rather resulted from his contributing medical conditions. *Id.*

that Mr. Lohse's narcolepsy (to the extent there is sufficient evidence that he had it) caused or contributed to Mr. Lohse's death.

### Unum has established, based upon evidence available to it in the Administrative Record, that Mr. Lohse had narcolepsy, a disease of the body[6]

As an initial matter, Unum contends that Plaintiff cannot argue that Mr. Lohse did not have narcolepsy when Plaintiff conceded that fact throughout the administrative review. Dkt. No. 26 at 7. The Fifth Circuit has stated a plaintiff "has not exhausted his administrative remedies on an issue if he fails to raise it before the plan administrator. Thus, a federal court should not address the issue because it does not have the opportunity to review the plan administrator's resolution of the issue under an arbitrary and capricious standard."[7] *Harris v. Trustmark Nat. Bank*, 287 Fed. Appx. 283, 288 (5th Cir. 2008). This reasoning suggests that Plaintiff's failure to raise the issue of whether Mr. Lohse had narcolepsy during the administrative process prevents him from raising it here. In light of the *de novo* review and that the Court finds in Unum's favor on this issue, the Court will consider Plaintiff's new assertion that Mr. Lohse did not have narcolepsy.

Plaintiff now asserts Mr. Lohse had only been diagnosed with insomnia, not narcolepsy. Dkt. No. 23 at 9; *see also id.* at 12 ("Dr. Ortiz's mentioning of said condition [in January 2018]

---

[6] It is undisputed that narcolepsy is a disease of the body. Narcolepsy is a "chronic neurological disorder caused by the brain's inability to regulate sleep-wake cycles" that can cause "excessive daytime sleepiness ... vivid hallucinations during sleep onset or upon awakening, and brief episodes of total paralysis." *Watley v. Dep't of Child. & Fams.*, 991 F.3d 418, 421 (2d Cir. 2021) (citing Nat'l Inst. of Neurological Disorders and Stroke, Narcolepsy Information Page, https://www.ninds.nih.gov/Disorders/All-Disorders/Narcolepsy-Information-Page (last modified Mar. 27, 2019)).

[7] However, there are circuit cases in which the courts explicitly reject an issue exhaustion requirement in the ERISA context. *Farr v. Hartford Life & Acc. Ins. Co.*, 322 Fed. Appx. 622, 628 & n.3 (10th Cir. 2009) (clarifying that *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1191 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the case relied upon by Unum, did not address whether "new grounds" means simply new evidence or whether it also includes arguments and theories, "which would be tantamount to imposing an issue exhaustion requirement on ERISA plaintiffs"); *see also Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 892 n. 7 (6th Cir. 2020) (reaffirming reaffirmed that a claimant is not required to exhaust her issues because of the non-adversarial nature of ERISA proceedings); *see also Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 632 (9th Cir. 2008) ("The non-adversarial nature of the ERISA proceeding weighs against imposing an issue-exhaustion requirement.").

does not equate to a diagnosis."). Plaintiff further asserts there is no record from February 2018 to November of 2019 that "Mr. Lohse had any symptoms for narcolepsy" or was being treated for narcolepsy. *Id.* at 9; *see also id.* at 12  ("Further, Mr. Lohse saw additional doctors after his visit with Dr. Ortiz. Again, none of the additional records—which were in Unum's possession—make mention of Mr. Lohse suffering from anything other than insomnia."). Plaintiff also contends that its statements throughout the administrative review that Mr. Lohse had narcolepsy were "argument[s] of counsel [that are] not evidence." Dkt. No. 22 at 15.

Unum properly considered Plaintiff's representation that Mr. Lohse had narcolepsy. As Unum notes, the rules about evidence that apply in a trial have no bearing on the claims process. *See* Dkt. No. 26 at 7-8 (citing *Harmon v. Bayer Bus*., No. CV H-14-1732, 2016 WL 397684, at *10 (S.D. Tex. Jan. 29, 2016) (explaining that "[t]he Federal Rules of Evidence . . . do not apply to an ERISA administrator's benefits determination, and we review the entire administrative record, including hearsay evidence relied upon by the administrator") (quoting *Black v. Long Term Disability Insurance*, 582 F.3d 738, 746 n.3 (7th Cir. 2009)). Unum states it was entitled to consider, and ultimately accept as consistent with the other record evidence, Plaintiff's uncontroverted representations during the administrative process.

But even putting aside Plaintiff's representation that Mr. Lohse had narcolepsy, there is sufficient evidence in the record to show that was the case. On January 25, 2018, Plaintiff reported to Dr. Ortiz with Sleep Medicine Consultants for a six-month follow-up for "chronic hypersomnolence [excessive sleepiness] /suspected Narcolepsy, insomnia and PLMS." AR 288-91. Dr. Ortiz noted Mr. Lohse was sleeping better at that time and was taking zaleplon which was "helpful for prolonged awakenings." AR 289. However, Plaintiff still reported being "sleepy for

many years" and "frequent episodes of bilateral leg weakness [cataplexy] with emotion lasting <2 minutes without [loss of control]." AR 289.  Under "Plan Notes," Dr. Ortiz noted as follows:

> Patient's symptoms and sleep study are consistent with Narcolepsy. Other causes of daytime sleepiness have been ruled out. We discussed a trial of xyrem to treat daytime sleepiness and cataplexy and he would like to try it. Stop clonaz and zaleplon when he starts xyrem. Continue Adderall 20 mg to control fatigue. He will return to clinic in 3 months.

AR 291.

Even though Dr. Ortiz's notes list insomnia as the diagnosis, the record clearly shows Mr. Lohse had symptoms of and was being treated for narcolepsy. While acknowledging that "excessive daytime sleepiness, cataplexy, and disrupted nighttime sleep" are all symptoms of narcolepsy, Plaintiff argues the "only slightly similar symptom Dr. Ortiz notes is that '[Mr. Lohse] had been sleepy for many years." Dkt. No. 22 at 16. However, as set forth above, in addition to Dr. Ortiz's clear statement that Mr. Lohse's symptoms were consistent with narcolepsy, Dr. Ortiz further stated that Mr. Lohse's symptoms included hypersomnolence (excessive sleepiness), "prolonged awakenings," and "frequent episodes of bilateral leg weakness" (cataplexy), all of which Plaintiff acknowledges are symptoms of narcolepsy.

This medical evidence is consistent with the police report, which stated Mr. Lohse had been diagnosed with narcolepsy. AR 445. In the investigator's opinion, the factors that contributed to the crash were that Mr. Lohse was "fatigued or asleep." AR 447, 454, 623. Illness was also listed as a possible contributing condition. AR 447, 454, 623. In sum, the record contains sufficient evidence to show that Mr. Lohse had narcolepsy.

### *Unum has not established Mr. Lohse's narcolepsy was a contributing cause of the loss*

However, the Court agrees with Plaintiff that Unum has not established that Mr. Lohse's narcolepsy caused or contributed to Mr. Lohse's death under the terms of the Group Policies (as

opposed to causing the accident which caused the death). *See* Dkt. No. 22 at 15; AR 999-1000. Unum does not dispute that the blunt-force trauma from the car accident is what killed Mr. Lohse. But Unum asserts the medical records show that Mr. Lohse had narcolepsy and suffered from hypersomnolence and the crash report attributes being fatigued or asleep as contributing causes to the accident. Dkt. No. 26 at 9. According to Unum, that is sufficient to show that Mr. Lohse's narcolepsy caused, contributed to, or resulted in Mr. Lohse's death.[8] *Id.* Thus, the question is whether the language of Unum's disease exclusion policy excludes coverage for the accidental loss when a disease, like narcolepsy, caused the accident that caused the loss. Put more bluntly, does the disease exclusion exclude coverage for losses that are indirectly (as opposed to proximately) caused by a disease?

Unum's disease exclusion denies coverage for accidental death benefits with respect to "any accidental losses caused by, contributed to by, or resulting from . . . disease of the body. . . ." AR 365, 1098. As explained below, the relevant cases describe this type of language as excluding diseases that are concurrent proximate causes of the loss, not as Unum argues, remote or indirect causes.

The Fifth Circuit has categorized two types of disease exclusion clauses recognized by the Texas Supreme Court – those which apply only when a disease is at least a concurrent proximate

---

[8] In Unum's June 8, 2021 appeals letter, Unum addressed Plaintiff's argument, pointing out the following: (1) the police investigation noted that Mr. Lohse had a diagnosis of narcolepsy; (2) the police report listed contributing factors of fatigue and asleep and a possible contributing factor of illness; (3) a review of the available medical data confirmed Mr. Lohse's history of narcolepsy (including Dr. Ortiz's January 25, 2018 office visit note which documented that Mr. Lohse's symptoms and sleep study were consistent with narcolepsy and other causes of daytime sleepiness had been ruled out); (4) there were no subsequent medical records to support that Mr. Lohse's condition had improved as of the date of the accident; (5) narcolepsy is a disease that can result it excessive daytime sleepiness and sudden attacks of sleep and cataplexy (brief periods of muscle weakness), and it is reasonable that Mr. Lohse's reported symptoms of narcolepsy, which is a disease of the body, caused, contributed to, or resulted in the accident that caused Mr. Lohse's death; (6) this conclusion is consistent with the police report and Plaintiff's counsel's statement ion the February 9, 2021 letter that "Jay Lohse's narcolepsy was the singular cause of the accident that resulted in his death." AR 1030-31.

cause and those which also apply when the disease was a more remote or indirect cause of the loss. *See Sekel v. Aetna Life Ins. Co.*, 704 F.2d 1335, 1337 (5th Cir. 1983) (discussing *Stroburg v. Ins. Co. of No. Am.*, 464 S.W.2d 827, 829–31 (Tex. 1971)). In the first category is the exclusion presented in *Stroburg* which provides that "[t]his policy does not cover loss *caused by or resulting from* any one or more of the following: ... [i]llness, disease ... bodily infirmity...." *Id.* (emphasis added). These types of exclusions exclude "coverage only where disease is at least ***a concurrent proximate cause***." *Id. (emphasis added)*.

For example, in *National Fire*, after considering the two types of exclusions discussed in *Stroburg*, the court concluded that the language of the policy "excluded liability only when the itemized risks were a proximate rather than an indirect or remote cause of the loss." *National Life & Accident Insurance Co. v. Franklin*, 506 S.W.2d 765, 768 (Tex.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.). The court further explained as follows:

> The words "contributed to" do not serve to allow us to look back along the chain of causation to a remote cause or a cause of a cause. The words "directly or indirectly" would serve this purpose, but "contributed to" does not avoid the proximate cause requirement of Stroburg. The true effect of "contributed to" is that the disease need only be a proximate cause rather than the [s]ole proximate cause to satisfy the exclusion. Since the epilepsy was, at most, a remote cause, the policy exclusion is inapplicable.

*Id.*

As an example of the second category presented in *Stroburg*, the Texas Supreme Court cites exclusions containing language precluding payment of benefits if disease contributed "directly or indirectly" to the loss. *Sekel*, 704 F.2d at 1337 (citing *Stroburg*, 464 S.W.2d at 831–32). These types of exclusions "effectively exclud[e] coverage where disease, though a functionally closely related significant contributing factor or cause is nevertheless neither a concurrent proximate nor the most immediately precipitating cause of loss." *Id.*

In *Sekel*, the insured fell to the floor and sustained a severe blow to the head, which resulted in his death one hour after the fall. The immediate cause of his death was the blow to his head, but the fall was attributed to a preexisting disease, "severe atherosclerotic and hypertensive cardiovascular disease," a natural condition, which had caused him to pass out and fall to the floor. *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 102 (5th Cir. 1993). The district court awarded accidental death benefits to the beneficiary, finding that the mere fact that the insured's hypertension may have caused him to pass out did not mean that the medical condition caused his death. However, the Fifth Circuit reversed on appeal, concluding the exclusion clause in the policy ("resulting from any injury caused or contributed by, or as a consequence of, any of the following excluded risks, ***even though the proximate or precipitating cause of loss is accidental bodily injury***") was within the second type described in *Stroburg* and barred recovery. *Sekel*, 704 F.2d at 1336-37, 1338, 1342 n. 12 (emphasis added).

Specifically, the court held that the exclusion clause precluded coverage because the "disease" or "bodily infirmity" of the insured caused or contributed to his death, "even though" his fall was the proximate or precipitating cause of his death. *Id.* at 1337-39. In reaching its conclusion, the *Sekel* court reasoned that

> We conclude that the Aetna exclusion clause is of the second type described in the *Stroburg* decision, and coverage is barred when a risk excluded by the policy is a functionally closely related significant cause or contributing factor of the loss even though a covered risk is the proximate and more immediate precipitating cause. A contrary interpretation disregards the clear and unambiguous meaning of the exclusion clause, especially its "even though" phrase. Mr. Sekel's heart condition, the "natural disease processes" of which caused him to pass out and immediately fall, striking his head and resulting in his death within approximately an hour, certainly bore a functionally close and significant causal or contributory relationship to his death. This is not an instance where for want of a nail the rider was lost.[2]

[FN2:] "A little neglect may breed mischief: for want of a nail the shoe was lost; for want of a shoe the horse was lost; and for want of a horse the rider was lost." Benjamin Franklin, Maxims prefixed to Poor Richard's Almanac.

*Sekel*, 704 F.2d at 1338.

Other courts have pointed out this same distinction in rejecting attempts to preclude recovery on the basis that the accident would not have happened but for the insured's illness. *See, e.g.*, *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 831 (10th Cir. 2008) (discussing, among other cases, *National Life & Accident Insurance Co. v. Franklin*, 506 S.W.2d 765 (Tex.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.)). In *Kellog*, the policy included language that is similar to the language found in Unum's policy, specifically providing that "[w]e will not pay benefits under this section for any loss caused or contributed to by: [ ] physical or mental illness or infirmity. . . ." 549 F.3d at 832. The Tenth Circuit concluded under a *de novo* standard of review that the car crash—not the seizure—caused the loss at issue, and therefore the exclusionary clause of the policy did not apply.[9] *Id.* at 829; *see also id.* at 832 ("Here, the loss (Brad Kellogg's death) was caused by a skull fracture resulting from the car accident, not by physical or mental illness. . . . While the seizure may have been the cause of the crash, it was not the cause of Brad Kellogg's death. The Plan does not contain an exclusion for losses due to accidents that were caused by physical illness, but rather excludes only losses caused by physical illness.").

Notably, the Tenth Circuit stated in a footnote that MetLife could have drafted the policy to exclude losses resulting from accidents caused by injury or illness, citing the Fifth Circuit cases

---

[9] In *Kellogg*, the beneficiary died following a car crash. *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 820 (10th Cir. 2008). A witness to the crash told responding police officers that it "appeared" that the beneficiary had suffered from a seizure as he lost control of the car. *Id.* The claims administrator denied the claim for death benefits, concluding that the loss was due to physical illness because the decedent's seizure was the cause of the crash. *Id.* at 829. The district court granted summary judgment in favor of MetLife on the grounds that the decedent did not die as a result of an "accident." *Id.* The Tenth Circuit determined MetLife was precluded from invoking the non-accidental basis for denying coverage and instead considered whether the death was "caused" by the purported seizure. *Id.*

of *Sekel* and *Moore* as examples. *Kellogg*, 549 F.3d at 832, n. 5. (citing *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 100 (5th Cir.1993) ("A loss that is the result of or contributed to by one of the following is not a covered loss <u>even though it was caused by an accidental bodily injury</u>: (1) A disease or infirmity of the mind or body."); *Sekel v. Aetna Life Insurance Co.*, 704 F.2d 1335, 1336–37 (5th Cir.1983) ("[N]o payment shall be made for ... any loss resulting from any injury caused or contributed to by, or as a consequence of, any of the following excluded risks, <u>even though the proximate or precipitating cause of loss is accidental bodily injury</u>: (a) bodily or mental infirmity; or (b) disease ...." (internal quotation marks omitted in *Kellogg*)) (emphasis added).

Unum contends that the phrase "contributed to by" in its disease exclusion broadened it to exclude diseases that are indirect causes of the loss. Dkt. No. 21 at 17, 24, 25-26. However, under the plain reading of the disease exclusion, the "contributed to by" language refers to the loss (the death) without any indication to capture indirect causes (such as the narcolepsy that caused the crash that caused the death). The court in *Kellogg* addressed this very issue, holding that the language excluding "losses that were caused *or contributed* to by physical illness [did] not change this analysis." *Kellogg,* 549 F.3d at 832 (emphasis original). According to the Tenth Circuit, a reasonable policyholder would understand this language to refer to causes contributing to the death, not the accident.[10] *Id.*

Unum cites *Southern Farm Bureau Life Insurance Co. v. Moore* to argue that the phrase "contributed to by" should be interpreted to capture indirect or remote causes. Dkt. No. 21 at 25-26. It is true that the policy exclusion there contained the "contributed to by" phrase, but it also contained an "even though" phrase: "A loss that is the result of or contributed to by one of the

---

[10] The Tenth Circuit also pointed out in a footnote that MetLife did not rely on the "contributed to" language in denying Kellogg's claim for benefits. *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 829 n.6 (10th Cir. 2008).

following is not a covered loss even though it was caused by an accidental bodily injury: (1) A disease or infirmity of the mind or body." *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 100 (5th Cir. 1993). Under the reasoning of *Sekel*, this language has to cover situations where the disease caused the accident but not the injury to give meaning to the "even though" phrase. *See Sekel*, 704 F.2d at 1338. However, Unum's policy does not exclude losses resulting from accidents caused by disease. Rather, it excludes "accidental losses caused by, contributed to by, or resulting from: disease of the body. . . ." AR 364-65.  It does not convey any intent to exclude diseases that indirectly cause the loss, such as the "even though" phrase contained in both *Sekel* and *Moore*.

Here, as explained above, the loss (Mr. Lohse's death) was caused by blunt-force trauma to the head resulting from the car crash, not by physical illness. While narcolepsy may have been the cause of the crash, it was not the cause of Mr. Lohse's death. Accordingly, Unum was incorrect in concluding that the disease exclusion applies.

### ii.     Unum's decision based on the crime exclusion

Although Unum relied primarily on the disease exclusion, it also concluded that the crime exclusion would apply if the disease exclusion did not. In the Second Determination Letter, Unum stated as follows:

> Additionally, given the fact that Mr. Lohse was driving on the wrong side of the road when the accident occurred, it is reasonable that this recklessness also contributed to his death. Driving on the wrong side of the road is a violation of the Texas Traffic Code.

AR 985.

The crime exclusion provides that the Group Policies do not cover for "any accidental losses caused by, contributed to by, or resulting from ... an attempt to commit or commission of a crime." AR 364-65. The Basic Group Policy includes a Glossary, but the Glossary does not define the term "crime." AR 371-74.

44

Unum asserts driving on the wrong side of the highway and "reckless driving" are crimes (misdemeanors) pursuant to Texas Transportation Code §§ 545.060 and 545.401, respectively. Dkt. No. 21 at 27-28. As pointed out by Unum, two circuit court cases have recently determined that reckless driving prior to an accident that resulted in the driver's death constituted a "crime" and triggered the crime exclusion in an Unum policy. *See Boyer v. Schneider Electric Holdings, Inc.*, 993 F.3d 578, 580 (8th Cir. 2021) (a case involving abuse of discretion review where the insured died while "passing vehicles in a no-passing zone and driving approximately 80 miles per hour in a 35 mile-per-hour zone," both misdemeanors under Missouri law); *see also Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 682-84 (6th Cir. 2022) (a cause involving de novo review where the insured was "traveling between 80 and 100 miles per hour, well above the 60 mile per hour speed limit"). Unlike in *Boyer* and *Fulkerson*, there is no evidence in the record here to establish that Mr. Lohse was driving in such a way at the time of the crash as to constitute "reckless driving."

Regarding Mr. Lohse's driving on the wrong side of the highway, the only evidence is from the crash report, which provides that Mr. Lohse "was traveling south on US 259 in the north bound lane," the driver of a northbound car "took evasive action and swerved to the left to avoid a head on collision," and Mr. Lohse struck the other car's trailer "in the right back quarter area." AR 145. Although Unum acknowledges there are several statutory exceptions to Texas Transportation Code § 545.051, Unum merely asserts the police report does not suggest that any of the statutory exceptions (e.g., to pass another vehicle or avoid an obstruction) were applicable. However, that is insufficient to meet its burden of proving, by a preponderance of the evidence, that the crime exclusion applies.

### d.      Summary

In sum, the Court does not find, on *de novo* review, that Unum has met its burden to show that either the disease exclusion or the crime exclusion applies. The Court therefore recommends Unum's motion for summary judgment be denied, and Plaintiff's motion for summary judgment be granted, as to Plaintiff's claim for wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B).

## C.      Plaintiff's breach of fiduciary claim under § 1132(a)(3)

Unum next contends that Plaintiff is not entitled to relief for breach of fiduciary duty. Relief pursuant to § 1132(a)(3) is limited to "appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S. Ct. 1065, 1078, 134 L. Ed. 2d 130 (1996). Accordingly, "[i]t is settled law in this circuit that a potential beneficiary may not sue for breach of fiduciary duty if he has a pending claim under section 1132(a)(1)(B) for benefits allegedly owed." *Burnside v. Anthem Blue Cross Blue Shield*, No. CIV.A. 1:05-CV-570, 2006 WL 3499202, at *10 (E.D. Tex. Dec. 1, 2006) (citing *Metropolitan Life Ins. Co. v. Palmer*, 238 F.Supp.2d 826, 830 (E.D.Tex.2002)); *see also Rhorer v. Raytheon Engineers & Constructors, Inc.*, 181 F.3d 634, 639 (5th Cir. 1999), *abrogated on other grounds by CIGNA Corp. v. Amara*, 563 U.S. 421, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011) ("Accordingly, because § 1132(a)(1)(B) affords Rhorer an avenue for legal redress, she may not simultaneously maintain her claim for breach of fiduciary duty."); *see also Martinez v. Prudential Ins. Co. of Am.*, 594 F. Supp. 3d 827, 844 (S.D. Tex. 2021) (holding that because the plaintiff had an avenue for legal redress through his benefits claim, the ERISA breach of fiduciary duty claim failed).

In this case, there was an adequate remedy available under § 1132(a)(1)(B), which Plaintiff has pursued in his claim for denial of benefits. Therefore, he may not simultaneously maintain a claim for breach of fiduciary duty under § 1132(a)(3). *See Tolson v. Avondale Industries, Inc.*, 141

F.3d 604, 610 (5th Cir. 1998) ("Because [the plaintiff] has adequate relief available for the alleged improper denial of benefits through his right to sue the Plans directly under section 1132(a)(1), relief through the application of [s]ection 1132(a)(3) would be inappropriate. . . .").

The Court therefore recommends Unum's motion for summary judgment be granted, and Plaintiff's motion for summary judgment be denied, as to Plaintiff's claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3).

**D.    Plaintiff's claim for attorney's fees and costs**

Plaintiff also asserts that he is entitled to attorney's fees and costs under ERISA Section 502(g)(1), which provides that a court "in its discretion may allow a reasonable attorney's fee and costs of action to either party." *Wegner v. Tetra Pak, Inc*., No. 4:20-CV-608-SDJ, 2022 WL 17347151, at *10 (E.D. Tex. Nov. 30, 2022) (quoting 29 U.S.C. § 1132(g)(1)). The Fifth Circuit had generally said a district court deciding whether to award fees under § 1132(g)(1) should consider the five factors articulated in *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980). *See, e.g., Todd v. AIG Life Ins. Co*., 47 F.3d 1448, 1458 (5th Cir. 1995). And the Supreme Court requires that a claimant "show 'some degree of success on the merits' before a court may award fees." *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co*., 737 Fed. Apps. 233 (5th Cir. 2018) (quoting *Hardt v. Reliance Standard Life Ins. Co*., 560 U.S. 242, 255, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010)). A claimant does not satisfy that requirement by achieving "trivial success on the merits" or a "purely procedural victor[y]," but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a "lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" *Hardt*, 560 U.S. at 255.

Considering the undersigned has made recommended findings of fact and conclusions of law to the District Judge, after which time the parties will have time to lodge any objections to those recommendations, it is too early to tell whether Plaintiff can show success on the merits. In the event the Court were to agree with the recommendations contained herein, the Federal Rules of Civil Procedure require that a claimant file a separate motion seeking fees. For these reasons, the Court finds Plaintiff's request for attorney's fees and costs is premature at this time.

The Court therefore recommends Plaintiff's motion for summary judgment as to Plaintiff's claim for attorney's fees and costs under 29 U.S.C. § 1132(g)(1) be denied without prejudice to refiling.

## V. RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Defendant's Motion to Summary Judgment and Brief in Support (Dkt. No. 21) be **GRANTED IN PART AND DENIED IN PART** as specified herein.  It is further

**RECOMMENDED** that Plaintiff's Motion for Summary Judgment and Brief in Support (Dkt. No. 22) be **GRANTED IN PART AND DENIED IN PART** as specified herein.

### Objections

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge.  28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed

determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

SIGNED this the 14th day of August, 2023.

J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE